**Opinion issued June 6, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00201-CR

————————————

**JOSHUA CURTIS DRYER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 10th District Court**
**Galveston County, Texas**
**Trial Court Case No. 17-CR-3187**

---

## OPINION ON REHEARING

On our own motion, we grant rehearing and withdraw our opinion and judgment dated April 13, 2023, and our order denying rehearing dated May 18, 2023. In place of our prior opinion, we substitute this one, in which we replace the names of two witnesses with initials. *See* TEX. R. APP. P. 9.10(a)–(b) (providing names of

those who were minors at time indicted offense occurred should not appear in court filings even when, as here, they are adults at time of trial); *see, e.g.*, *Ingerson v. State*, 559 S.W.3d 501, 503 n.3 (Tex. Crim. App. 2018) (using pseudonym for witness who was minor when indicted capital murder occurred). Our disposition remains unchanged. Because we issue this new opinion, we deny all other relief sought by the State or another on rehearing. We also deny the State's motion for en banc reconsideration as moot in light of the withdrawal and substitution of our prior opinion and judgment. *See Giesberg v. State*, 945 S.W.2d 120, 128, 131 & n.3 (Tex. App.—Houston [1st Dist.] 1997) (supp. op. on reh'g) (granting rehearing, issuing supplemental opinion, and dismissing motion for en banc reconsideration as moot), *aff'd*, 984 S.W.2d 245 (Tex. Crim. App. 1998).

A jury found Joshua Curtis Dryer guilty of the crime of continuous sexual abuse of a young child and sentenced him to 35 years of imprisonment. Dryer appeals, arguing his trial lawyer was ineffective in failing to object to the admissibility of an extraneous sexual act directed toward another who was not a child at the time. We reverse the trial court's judgment and remand for a new trial.

## BACKGROUND

### Introduction

In 2018, a grand jury indicted Dryer for continuous sexual abuse of a young child. *See* TEX. PENAL CODE § 21.02(b). The indictment alleged that between August

2

2009 and August 2015 Dryer sexually abused his daughter, I.D., twice or more by intentionally and knowingly touching her genitals and penetrating her sex organ with his finger, the former conduct constituting the offense of indecency with a child and the latter conduct constituting the offense of sexual assault of a child.

Dryer pled not guilty. In February 2022, the case was tried to a jury.

**Pretrial Hearing on K.M.'s Testimony**

Before trial, the State gave notice that it intended to introduce evidence of an extraneous offense, specifically that Dryer had committed assault by contact against a different victim. According to the notice, Dryer had done so by touching and rubbing the leg of K.M. in August 2017.

At the time of trial, K.M. was 22 years old. She initially took the stand at a hearing outside the presence of the jury so that the trial court could assess the admissibility of her proposed trial testimony. During this hearing, K.M. testified that she had been longtime friends with I.D. in the past. K.M. had spent the night at I.D.'s house quite a few times back then.

The very last time K.M. spent the night at I.D.'s house was for a slumber party or sleepover when she was "about 16." While the other girls were upstairs, K.M. watched a movie downstairs with Dryer and I.D.'s brother, Z.D. Z.D. had fallen asleep. K.M. was sitting next to Dryer on the couch. At some point during the movie, Dryer placed his hand on her upper thigh over her shorts and started moving it toward

3

her "private area." In response, K.M. "shot up off the couch" and "ran upstairs." She said she did not think Dryer saw her "run up the stairs crying."

Once upstairs, K.M. told I.D. what had happened. K.M. said she was crying, and that I.D. "looked terrified," as if she was "about to cry." K.M. said she had not ever seen I.D. appear so scared. Later that night, I.D. confided that Dryer had done inappropriate things to her.

K.M spoke to the police about the sleepover incident. She was not sure when but thought she did so about six months afterward. K.M. sat for this interview with the police in connection with the allegations of sexual abuse that I.D. had made against Dryer. K.M. had not gone to the police contemporaneously with the sleepover incident. Nor had she reviewed the statement she gave to the police before trial. K.M. acknowledged that she had told the detective who interviewed her that she had overreacted to the sleepover incident. But K.M. denied that she had told the detective that Dryer's touching was non-sexual in nature.

After K.M. testified, the State argued her testimony was admissible under Article 38.37 of the Texas Code of Criminal Procedure on the basis that Dryer's touching of K.M. was a sex act committed against another child. Among other things, the State observed that because there was no medical evidence in this case, the prosecution essentially rested on witness credibility, which made evidence that

Dryer had made a sexual advance on another child "extremely important" because it corroborated I.D.'s allegations of abuse.

The defense objected to K.M.'s testimony, but the basis for its objection is not altogether clear. The basis of the objection appears to have been that because K.M. had told the detective who interviewed her that Dryer's touching was non-sexual, the slumber-party incident was irrelevant or that its relevance was substantially outweighed by the danger of unfair prejudice.

The trial court ruled that K.M.'s testimony was admissible.

### Trial Testimony

### *State's Case in Chief*

Angela Black, I.D.'s mother, was the first witness. She testified that she previously had been married to Dryer for about 17 years. Together, Black and Dryer had two children, a daughter, I.D., and a son, Z.D. At the time of trial, I.D. was 20 years old and Z.D. was 17 years old.

When I.D. was in junior high school—between the ages of 12 and 14—Black noticed that I.D. had become depressed and started cutting herself. At the time, Black thought "it was kind of just normal teenage stuff." She did not notice anything amiss between Dryer and I.D.

Black first became aware that something was amiss when Child Protective Services contacted her in August 2017. Afterward, the police removed Dryer from

5

the home, and Black filed for separation. The children remained with her. Dryer was disallowed any further contact with the children due to the nature of I.D.'s allegations against him.

Black recalled the sleepover, which was for I.D.'s sixteenth birthday. Black said that I.D. and K.M. were close friends at the time. K.M. was "a bit older" than I.D., but Black did not know the exact age difference between the two girls. Black did not have any contemporaneous awareness of or knowledge about the sleepover incident involving K.M.

Black knew the general nature of I.D.'s allegations of sexual abuse by Dryer. But Black did not know the specifics and had not discussed the details with I.D. Though I.D.'s allegations shocked Black, she testified that she believed her daughter. According to Black, I.D. did not have a history of lying and she would not lie about something of this nature.

K.M. then took the stand. She testified she was 22 years old.

According to K.M., she and I.D. were close friends for a long time in their teens. At one point in time, the two had been best friends. During this period of time, K.M. also got to know I.D.'s family.

K.M. spent time at I.D.'s home. In doing so, K.M. had the opportunity to observe I.D. interacting with her father, Dryer. K.M. did not see anything out of the

ordinary, such as sexual contact or the like. I.D. and Dryer appeared to have a normal father–daughter relationship.

In August 2017, K.M. spent the night at I.D.'s home with several other girls. K.M. testified that she was "around 16" at the time.

At one point during the sleepover, I.D. and the other girls were in her room upstairs while K.M. was in the living room downstairs watching a movie. K.M. was seated on one of two couches. I.D.'s brother, Z.D., who fell asleep during the movie, was lying on the other couch. Dryer later joined them, seating himself on the couch next to K.M.

The State asked K.M. whether something happened between her and Dryer while watching the movie. The defense then urged its "original objections" to K.M.'s testimony and asked for a limiting instruction. The trial court overruled the objection but instructed the jury that K.M.'s testimony concerned a separate offense, which the trial court was admitting into evidence for any bearing it had on any relevant matter in the case, including Dryer's character and acts performed in conformity with his character.

K.M. then testified that as the credits of the movie were rolling, she noticed that Dryer's hand was on her thigh. Dryer then began moving his hand up her thigh, to where her shorts started covering her thigh, and "towards" her "private area." According to K.M., Dryer's hand never went under her shorts or even over them.

7

When Dryer's hand reached the point where her shorts began to cover her thigh, K.M. then "stood up." K.M. said she "jumped off the couch" and briskly walked upstairs.

K.M. went straight to I.D.'s room and began crying. She told the girls what happened. In response, I.D. looked scared. K.M. and I.D. then had a conversation about the incident in the hall.

About a week after the incident, K.M. told her parents about it. Six months or so after the incident, K.M. spoke with a detective. But K.M. testified that when she spoke with the detective, she did not describe the incident as seriously as it was because she was young at the time. Due to her youth, K.M. said she did not appreciate what had happened.

The State introduced into evidence a video recording of K.M.'s interview. But it was not played for the jury when it was admitted into evidence.

On cross-examination, K.M. agreed that she told I.D. on the night of the sleepover that she probably overreacted to the incident with Dryer. K.M. also agreed that she had told the detective during the subsequent interview that Dryer's touching of her leg was not sexual in nature. K.M., however, no longer felt like she had overreacted at the time. She testified that Dryer's contact was not accidental or innocent.

On the night of the sleepover, I.D. did not disclose any sexual abuse to K.M. K.M. said I.D. first told her about the abuse afterward.

K.M. said on cross-examination that she was born in November 1999. So, she was almost 18 years old when Dryer touched her.

Detective W. Higgs of the Friendswood Police Department, who was assigned to investigate the abuse allegations against Dryer, testified next.

As part of the investigation, I.D. was forensically interviewed at the Child Advocacy Center in Galveston. This interview was conducted by a non-peace officer who was trained to interview children in sex abuse cases. Higgs arranged this interview, but he was not present during it. Instead, he watched a recording of the interview after it had taken place.

Because the sexual abuse that I.D. alleged had taken place a year or more beforehand, Higgs did not arrange for a sexual assault examination.

As part of his investigation, Higgs also interviewed K.M. about the sleepover incident. This interview was recorded on video. The interview took place in October 2017. Higgs had not reviewed the video recording of the interview between then and the date of the trial.

Higgs also interviewed Black, I.D.'s mother, by telephone.

Finally, I.D. testified. She was 20 years old at trial.

I.D. testified that Dryer began sexually abusing her when she was 8 years old. She had her own bedroom, and that is where she was abused. She slept in a loft bed at one point, but she later slept in a daybed. All the abuse she recalled took place when she slept in the latter.

I.D. said the abuse took place late at night while she was trying to sleep. Dryer would enter her room, kneel by her bed, and move her blankets and clothes aside and touch her. Specifically, he touched her vagina with his fingers and inserted them into her vagina. Dryer engaged in this conduct from the time I.D. was 8 years old until she was 13 years old. She said this happened at least two to five times per month during this period. I.D.'s memories of the individual instances of abuse during this period were "kind of blurred together because they were very similar."

When this happened, I.D. would pretend to be asleep. She did so because she was afraid and "froze as a trauma response." She kept her eyes closed but peeked, which is how she knew it was Dryer.

I.D. said Dryer tried to place her hand on his penis on one occasion. Her hand grazed his penis, but she pulled away and pretended to stir awake, at which point he stopped and left her bedroom. I.D. also recalled Dryer touching her buttocks over her clothes on other occasions. But these incidents occurred while she was awake, and she and Dryer were watching movies together. I.D. said Dryer would place and

keep his hand on her buttocks. She testified that one time Dryer also squeezed her buttocks.

I.D. also recalled Dryer touching himself sometimes. She did not see his penis, but she could "see his arm moving" and "heard noises."

Eventually, the abuse ended. I.D. attributed the end of abuse to a change of residence. Her family moved in with her paternal grandmother and resided there for about one-and-a-half to two years. During this period, I.D.'s bedroom had a door that she could lock. When I.D. was 15 years old, her family moved back into their own home. Dryer did not resume sexually abusing I.D. after they moved back into their own home.

Even though the abuse ended, I.D. continued to experience its effects. She testified that she was "extremely depressed," "extremely anxious," and "self-harming." She was "not coping very well" and did "poorer in school." I.D. testified she "was having a really hard time."

I.D. first told someone—her then boyfriend—about the sexual abuse when she was 15 years old. She did not tell him all the details. And she asked him not to tell anyone because she was afraid of what would happen to her family and her relationships with family members if he did so.

Not long afterward, I.D. indicated to her paternal grandmother that she had been sexually abused. Her grandmother initially asked I.D. if the abuser was her

boyfriend, and I.D. told her it was not. Her grandmother then asked if it was her father, and I.D. "nodded her head" in reply. Once again, I.D. did not divulge details about the nature of the sexual abuse. Her grandmother asked I.D. if she wanted to go to the police. I.D. said she did not because she was still afraid to disclose the abuse to others.

I.D. recalled the sleepover, when K.M. and several other girls spent the night at her family's home. This sleepover was for I.D.'s sixteenth birthday. At the sleepover, I.D. and all the girls other than K.M. were upstairs in her bedroom at one point while K.M. remained downstairs watching a movie. K.M. later "came upstairs crying." K.M. told I.D. that Dryer "had touched her on her upper thigh" and had moved his hand "up her leg." I.D. testified that she did not tell K.M. that night that Dryer had sexually abused her.

The next day, I.D. told a different friend that she had been sexually abused. I.D. asked her friend not to tell anyone about the abuse.

A little more than a week after the sleepover, I.D. was questioned by an employee of Child Protective Services about the sexual abuse. This CPS employee showed up at her home accompanied by a police officer. I.D. was not expecting this visit. I.D. was asked whether she was being sexually abused and she "nodded." But I.D. did not disclose any details about the abuse in her conversation with the CPS employee.

12

During a subsequent interview at the Child Advocacy Center in Galveston, I.D. disclosed the details of the sexual abuse. I.D. testified that she disclosed the same details that she had disclosed in her trial testimony.

### *Defense Witnesses*

The first witness called by the defense was Elizabeth Marsalis, who is Dryer's stepsister. Her father is married to Dryer's mother.

Marsalis testified that her children have spent time with Dryer, and Marsalis has no concerns about allowing Dryer to spend time with her daughter alone. She has seen Dryer in the presence of young and teenage girls and has never seen him behave inappropriately with them. Marsalis further testified that she knows Dryer to be peaceful, law-abiding, and honest.

John Brown then testified. Brown's partner is Dryer's brother, and Brown has known Dryer for about a decade. Brown testified that Dryer is a peaceful, law-abiding, truthful, and trustworthy person. He has seen Dryer and I.D. together and never saw anything inappropriate.

Robert Garcia took the stand next. Garcia is Dryer's stepbrother. Garcia testified that Dryer is honest, trustworthy, and law-abiding. Garcia described Dryer as a loving, caring father. Garcia said he had never seen I.D. behave as if she was scared of Dryer.

13

Paula Masone, who has been friends with Dryer for more than two decades, also testified. Like Garcia, Masone never saw I.D. behave as if she was afraid of Dryer or behave in an aloof or standoffish manner. As a mother of a young girl, Masone said she would have noticed such behavior. Masone said that Dryer is honest, law-abiding, and a perfect gentleman.

Robin Garcia then testified. She is Dryer's mother, I.D.'s paternal grandmother. Garcia testified that Dryer had never exhibited behavioral problems as a child and did not have any problems with the law.

Garcia testified that she has spent quite a bit of time around Dryer, his wife, and their children. They lived with her for almost two years. And Garcia had a close relationship with I.D. before these allegations.

Garcia denied ever having a conversation with I.D. in which I.D. said that she was being sexually abused. According to Garcia, I.D. complained that people came into her room, including Dryer. But there was no implication of any sexual impropriety by Dryer. The subject of sexual abuse allegations in general did come up during this conversation—as part of a discussion of the #metoo movement—and Garcia then asked if anyone had ever touched I.D. Garcia said that I.D. responded "no."

Garcia had seen Dryer around I.D. and other young girls on many occasions. Garcia said she never saw him behave inappropriately.

On cross-examination, Garcia conceded that there is nothing I.D. could ever say that would convince Garcia that Dryer had sexually abused I.D.

Gilbert Garcia, Robin's husband and Dryer's stepfather, testified next. Dryer's family lived with Garcia and his wife for two years. Garcia testified that he did not see anything that would have indicated "that there was a lack of love" between Dryer and I.D. He further testified he never saw anything indicating something was amiss in their relationship.

After Gilbert Garcia testified, the defense requested that the video recording of K.M.'s interview with Detective Higgs be played for the jury. Though it had previously been admitted into evidence, it had not yet been played.

Per the recording's date-time stamp, the interview took place in October 2017. K.M. began by stating her name and date of birth, November 16, 1999. So, she was 17 years old at the time of the interview.

During the interview, K.M. described Dryer as being "handsy" or "into hugs and all that." But she thought this was just him "being friendly." On the night of the sleepover at I.D.'s home, she began watching a movie with I.D.'s younger brother and one of his friends in the living room. K.M. sat on the couch next to them. Later, Dryer joined them and sat down next to K.M. Eventually, she noticed that Dryer had his hand on her upper thigh, over her pants. In response, K.M. said she "kinda froze" because it was "strange." After a while, she "scooted" closer to the two boys, and

15

Dryer then began moving his hand up and down her thigh and rubbing it with his thumb. He also touched her side (torso) but did not touch her elsewhere.

K.M. told the detective that after a while the two boys went upstairs. She did not think that they had seen Dryer touching her, as she was sitting under a blanket. Once it was just K.M. and Dryer in the living room, she did not know what to do because she was "really freaked out." But when the movie ended, K.M. "jumped off the couch" and "ran upstairs" where she then told I.D. what had happened to her.

When K.M. told I.D., I.D. "didn't really say anything." K.M. said that I.D. gave her "this look." Looking back, K.M. said, this should have cued her in that "something wasn't right." According to K.M., I.D.'s facial expression seemed to convey a sentiment something along the lines of: "Oh great, this is happening again."

Finally, Dryer took the stand to testify in his own defense.

About the August 2017 sleepover, Dryer testified that he joined K.M., his son, Z.D., and his son's friend in watching a movie out of concern that it would be best if boys and girls did not mingle at night unsupervised. According to Dryer, there were two couches in the living room but all four of them were sitting on the same one during the movie. Dryer sat on one end of the couch next to K.M. He said that his wife, Black, was also in the living room, on the second couch, while they watched the movie.

Dryer denied that he touched K.M.'s inner thigh. He also indicated that he did not intentionally touch her elsewhere in any manner:

Q. Did you ever touch her at all?

A. Not that I'm aware of.

Q. I mean, is it possible you touched her on the shoulder or something?

A. It—I guess it's possible, but I don't recall. I mean, we're watching a jump-scary movie. And pretty—you know, everybody would jump every now and then. I don't know—I don't know if I accidentally bumped her or something.

Dryer said that he had heard K.M.'s testimony about leaving the room crying. But he said he did not see anything resembling that.

After midnight, Dryer testified, he found K.M. in Z.D.'s room on the floor "under a blanket" with Z.D.'s friend. Dryer told her to leave Z.D.'s room and stay separate from the boys the rest of the night. According to Dryer, K.M. "got mad" and told him "no." At that point, Dryer went to his wife and asked her to handle the situation, which his wife then did.

As to I.D.'s allegations, Dryer categorically denied them. Asked why she would make them, Dryer responded, "I have no idea."

Dryer maintained that I.D. had a loft bed from the time she was about seven or eight years old until they moved into his mother's home. This bed was elevated off the ground high enough for Dryer to almost stand beneath it. The mattress was basically at eye-level for him when standing. He said I.D. did not have a daybed

during this time. Thus, he maintained it was impossible for him to have knelt beside her.

*State's Rebuttal Witnesses*

Quinten Chambers, a friend of Z.D.'s, testified. Chambers stated he had known Z.D. for 10 or 11 years as of the time of his testimony, had been in Dryer's home, and that when he was there I.D. did not have a loft bed. But he conceded that on Facebook he had seen old photographs, from sometime before he had met Z.D., in which I.D. had a loft bed in her bedroom.

Black retook the stand next. Since testifying during the State's case in chief, Black had gone through old family photographs to ascertain when I.D. switched from sleeping in a loft bed to the daybed. The State introduced several of these photographs, taken between 2012–14, into evidence. Some of these showed I.D. in a daybed in her bedroom in the family's home when she was between the ages of 11 and 12 years old. One of the photos showed Dryer and I.D. in her bedroom with a daybed during the same general timeframe, when she was either in the fifth or sixth grade. Black said I.D. had the daybed well before these photographs as well.

Black also testified that on the night of the August 2017 sleepover, she did not watch the movie with the others. She had already gone to bed.

Elizabeth Wethers then testified. Wethers had been Black's best friend since at least junior high school. She stated that Black had given her I.D.'s loft bed

18

sometime in 2013, when I.D. got a new one. In conjunction with her testimony, the State introduced a November 2013 Facebook post made by Wethers showing the loft bed in her home.

Finally, the State called Z.D. Z.D., I.D.'s brother and the defendant's son, was 17 years old at trial. According to Z.D., I.D. stopped using a loft bed "sometime before she even went into junior high."

Z.D. also testified about the sleepover. He testified that his mother, Black, had gone to bed when he and others watched the movie. According to him, he, his friend, and K.M. all went upstairs at the same time, before the movie ended. He did not notice K.M. crying. In addition, Z.D. denied that Dryer caught K.M. with his friend or that a confrontation between Dryer and K.M. occurred that night.

## Jury Verdict and Trial Court's Judgment

The jury found Dryer guilty as alleged in the indictment and assessed his punishment at 35 years of confinement. The trial court rendered a judgment of conviction in accord with the jury's verdict.

## DISCUSSION

The trial court admitted into evidence K.M.'s testimony under Article 38.37 of the Texas Code of Criminal Procedure. Under this article, in certain prosecutions, including prosecutions for the continuous sexual abuse of a young child, the trial court may admit into evidence "for any bearing the evidence has on relevant matters,

19

including the character of the defendant and acts performed in conformity with the character of the defendant," evidence that the defendant committed any of a number of enumerated separate offenses. TEX. CODE CRIM. PROC. art. 38.37, § 2(a)(1)(B), 2(b). The enumerated separate offenses include sex trafficking of a child, continuous sexual abuse of a young child or disabled individual, indecency with a child, sexual assault of a child, aggravated sexual assault of a child, online solicitation of a minor, sexual performance by a child, possession or promotion of child pornography, and an attempt or conspiracy to commit any of the preceding offenses. *Id.* § 2(a).

On appeal, Dryer argues that his trial lawyer provided ineffective assistance by failing to object that K.M.'s testimony was inadmissible under Article 38.37 because she was 17 years old when Dryer allegedly touched her upper thigh. Because K.M. was not a child at the time and Article 38.37 only allows for the admission of certain sex-related offenses committed against children, Dryer maintains that the trial court would have had no choice but to sustain such an objection. Thus, had his trial lawyer made this objection, the jury would never have heard K.M.'s testimony, which was damning evidence from a second accuser in what otherwise would have been a trial that boiled down to Dryer's word versus his daughter's. But for K.M.'s testimony, Dryer urges, the jury might not have found him guilty.

**Law Applicable to Ineffective-Assistance Claims**

The Sixth Amendment to the United States Constitution guarantees the right to counsel in criminal prosecutions. *Cannon v. State*, 252 S.W.3d 342, 348 (Tex. Crim. App. 2008). This guarantee entails the right to effective assistance. *Id.*

To prevail on a claim of ineffective assistance of counsel, a defendant must prove that his trial lawyer's performance was deficient and this deficiency prejudiced the defense. *Miller v. State*, 548 S.W.3d 497, 499 (Tex. Crim. App. 2018). The defendant bears the burden of proving deficient performance and prejudice by a preponderance of the evidence. *Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010). Unless the defendant proves both deficient performance and prejudice, we cannot sustain his claim of ineffective assistance of counsel. *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). The purpose of this test for ineffective assistance is to ascertain whether defense counsel's conduct so undermined the proper functioning of the adversarial process that it calls into question the reliability of the jury's verdict. *Villa v. State*, 417 S.W.3d 455, 463 (Tex. Crim. App. 2013).

Defense counsel's performance is deficient if it falls below an objective standard of reasonableness. *Prine v. State*, 537 S.W.3d 113, 117 (Tex. Crim. App. 2017). Judicial scrutiny of counsel's performance is highly deferential. *Mata v. State*, 226 S.W.3d 425, 428 (Tex. Crim. App. 2007). There is a strong presumption that counsel's performance was reasonable, and the defendant must overcome this

21

strong presumption to prevail on an ineffective-assistance claim. *Prine*, 537 S.W.3d at 117. Therefore, any deficiency in counsel's performance must be firmly founded in the record. *Id.* It is not enough that counsel's performance may seem questionable in hindsight. *Id.* We cannot find that counsel's performance was deficient based on conjecture. *Scheanette v. State*, 144 S.W.3d 503, 510 (Tex. Crim. App. 2004). Nor can we infer that counsel's performance was deficient based on portions of the record that are unclear. *Mata*, 226 S.W.3d at 432. Rather, the record must affirmatively show that counsel's performance was deficient. *Prine*, 537 S.W.3d at 117.

It is rare that the trial record, standing alone, is sufficient to show deficient performance by counsel. *Nava v. State*, 415 S.W.3d 289, 308 (Tex. Crim. App. 2013). The reasonableness of counsel's decisions often depends on facts that do not appear in the record. *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002). Hence, counsel ordinarily should be afforded the opportunity to explain his conduct before we find that his performance was deficient. *Nava*, 415 S.W.3d at 308. When counsel has not been given this opportunity, we cannot find counsel's performance deficient unless his conduct was so outrageous that no competent lawyer would have engaged in it. *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012). That is, the record must show that counsel's performance fell below an objective standard of reasonableness as a matter of law and that no reasonable trial strategy could justify his deficient performance. *Lopez*, 343 S.W.3d at 143. We generally will assume that

22

counsel had a reasonable strategic motive if any reasonable trial strategy can be imagined. *Okonkwo v. State*, 398 S.W.3d 689, 693 (Tex. Crim. App. 2013).

Deficient performance by defense counsel prejudices the defendant when there is a reasonable probability that but for counsel's deficient performance the trial's outcome would have differed. *Nava*, 415 S.W.3d at 308. A reasonable probability is one that undermines our confidence in the trial's outcome. *Id.*

A defendant is not entitled to errorless representation. *Frangias v. State*, 450 S.W.3d 125, 136 (Tex. Crim. App. 2013). We therefore must review an ineffective-assistance claim with an eye toward the totality of the representation. *Id.* A single error will seldom suffice to prove ineffective assistance. *Villa*, 417 S.W.3d at 463. A single error does so only if it is both egregious and had a seriously deleterious impact on counsel's representation as a whole. *Frangias*, 450 S.W.3d at 136.

**Analysis**

***Deficient Performance***

The record shows K.M. was 17 years old when Dryer allegedly touched her thigh at the sleepover. At the beginning of her recorded interview, K.M. stated she was born on November 16, 1999. Uncontradicted testimony shows that the sleepover took place in August 2017. Together, these facts establish that K.M. was not a child for purposes of any of the separate sex offenses that conceivably could apply to Dryer's touching of K.M. that could make her testimony admissible under Article

23

38.37 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. art. 38.37, § 2 (rendering admissible certain enumerated separate offenses, including continuous sexual abuse of young child, indecency with child, sexual assault of child, and aggravated sexual assault of child); PENAL §§ 21.02(a)(1), 21.11(a), 22.011(c)(1), 22.021(b)(1) (defining "child" for purposes of preceding offenses or otherwise limiting their applicability to those "younger than 17 years of age"). Consequently, K.M.'s testimony was not admissible under Article 38.37.[1]

Thus, the question is whether Dryer's trial lawyer was deficient in failing to object that K.M.'s testimony was categorically inadmissible under Article 38.37. Because Dryer's counsel has not been afforded the opportunity to explain his failure to object on this ground and the record does not otherwise disclose counsel's thinking on the subject, we can only answer this question in the affirmative if counsel's failure to make this objection was so outrageous that no competent lawyer would have failed to object on this ground. *See Menefield*, 363 S.W.3d at 593.

---

[1] We note that "child" is not universally defined as one younger than 17 years of age for purposes of sex-related offenses against children. For example, online solicitation of a minor defines "minor" as one "who is younger than 17 years of age" or "whom the actor believes to be younger than 17 years of age." PENAL § 33.021(a)(1). And several sex-related offenses, including sex trafficking, sexual performance by a child, and possession or promotion of child pornography, all apply to victims who are "younger than 18 years of age." PENAL §§ 20A.01(a), 43.25(a)(1), 43.26(a)(1). But none of these offenses—online solicitation of a minor, sex trafficking, sexual performance by a child, and possession or promotion of child pornography—are even arguably applicable here.

24

We hold that no competent lawyer would have failed to make this objection because the inadmissibility of K.M.'s testimony is plain on the face of the record and no reasonable counsel could have decided that the defense would be better served by its admission than its exclusion. That is, we cannot imagine any reasonable trial strategy that would excuse or explain trial counsel's failure to object to K.M.'s testimony, which was categorically inadmissible and unfavorable to the defense.

Ineffective-assistance claims must be evaluated on a case-by-case basis. *See Okonkwo*, 398 S.W.3d at 693 (stating that judicial evaluation of ineffective-assistance claims turns on "all the circumstances" and observing that act or omission by counsel that is unreasonable in one case may be reasonable in another one). Thus, while we do not lay down a rule of universal application, we think it will be a rare situation in which failing to object to evidence categorically inadmissible under Article 38.37 of the Texas Code of Criminal Procedure is not deficient performance. To explain why, we must briefly consider Article 38.37's purpose and effect.

Ordinarily, our rules of evidence make separate offenses that a defendant committed against others inadmissible during the guilt-innocence phase of a criminal trial, at least for purposes of proving the defendant's character to show he acted in accord with his character on a particular occasion. *See* TEX. R. EVID. 404(a)(1), (b)(1) (disallowing evidence of crimes, wrongs, and other acts for this purpose and also disallowing evidence of character to prove that person acted in accord with his

25

character); *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007) (extraneous-offense evidence inadmissible when it has no relevance apart from character conformity); *see also* TEX. R. EVID. 405 (limiting manner in which person's character may be proved in limited circumstances in which such evidence is allowed). Article 38.37 upends this result by making evidence of certain enumerated separate offenses admissible in prosecutions of sex-related crimes committed against children. *See* TEX. CODE CRIM. PROC. art. 38.37, § 2(b) (making this evidence admissible notwithstanding Rules 404 and 405 of Texas Rules of Evidence).

Our court has previously recognized that Article 38.37 makes this evidence admissible because prosecuting sex crimes committed against children is especially difficult due to the trauma visited on young victims. *Cox v. State*, 495 S.W.3d 898, 904 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd). This can lead to delays in the reporting or discovery of these crimes, during which evidence disappears. *Id.* Often the only significant evidence at trial may be the child's uncorroborated testimony, and children are often targeted for these crimes in part because they tend to be poor witnesses. *Id.* Article 38.37 remedies these evidentiary obstacles by allowing prosecutors to introduce evidence of similar sex-related offenses committed against other children that would otherwise be inadmissible. *See id.*; *see also Caston v. State*, 549 S.W.3d 601, 610 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (noting that Article 38.37 arms prosecutors with additional evidence due to tendency of child's

credibility to become focal issue when prosecution turns on child's uncorroborated testimony or boils down to credibility battle between accused and child). This evidence is admissible for any relevant purpose, including as proof of the defendant's character and propensity to act in conformity with his character. TEX. CODE CRIM. PROC. art. 38.37, § 2(b); *Castillo v. State*, 573 S.W.3d 869, 880 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). In other words, the State can offer evidence of these separate crimes to prove the defendant is guilty of the crime charged. As we have previously observed, perhaps with a degree of understatement, this kind of "testimony of another child victim is damning evidence." *Id.* at 883.

In this particular case, the lone testimony the jury heard about Dryer's sexual abuse of I.D. came from I.D. herself. There was no other testimony or physical evidence as to Dryer's commission of the charged offense, continuous sexual abuse of a young child. Without K.M.'s testimony about the sleepover incident, the jury would have had to reach a verdict based on either I.D.'s uncorroborated testimony or the jury's evaluation of her credibility relative to Dryer, assuming he would have chosen to testify in a trial that did not include K.M.'s additional allegations. Under these circumstances, a defense lawyer could not reasonably forego an objection that would bar the jury from hearing the damning testimony of a second accuser in corroboration of the charged offense. There is no reasonable trial strategy that would allow counsel to let a jury hear this highly prejudicial inadmissible evidence. *See*

*Robertson v. State*, 187 S.W.3d 475, 484 (Tex. Crim. App. 2006) (observing that when defense principally rests on defendant's credibility weight of authority supports holding that his trial lawyer performs deficiently by allowing jury to hear prejudicial and clearly inadmissible evidence, like prior convictions, during trial's guilt-innocence phase because doing so could serve no strategic purpose); *Agbogwe v. State*, 414 S.W.3d 820, 833 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (same). Thus, Dryer's trial lawyer's performance was deficient in this respect as a matter of law. *See Lopez*, 343 S.W.3d at 143; *see also Rodriguez v. State*, No. 14-17-00388-CR, 2018 WL 6493880, at *4 (Tex. App.—Houston [14th Dist.] Dec. 11, 2018, no pet.) (mem. op., not designated for publication) (assuming, without deciding, that defense counsel's failure to object that TEX. CODE CRIM. PROC. art. 38.37, § 2 did not apply to extraneous offense because victim against whom it was committed was adult constitutes conduct so outrageous that no competent lawyer would have engaged in this conduct).

The State argues that the record was less clear as to K.M.'s age than Dryer suggests, noting that during the pretrial hearing on the admissibility of K.M.'s testimony she said that she was about 16 years old at the time of the sleepover. Thus, the State maintains that it would not have been immediately clear to Dryer's lawyer, or any reasonable defense lawyer, that she was in fact 17 years old at the time.

The flaw in the State's argument is that the clerk's record establishes that Dryer's trial lawyer reviewed or received a copy of K.M.'s October 2017 videorecorded interview in October 2018—more than three years before the February 2022 pretrial hearing on the admissibility of her testimony. In the interview, K.M. stated her date of birth—November 16, 1999—at the outset. Later during the interview, which only lasted about eight-and-a-half minutes, both K.M. and Detective Higgs acknowledged that she was not a child at the time of the August 2017 sleepover. Higgs at one point asked K.M. for her date of birth a second time, which she again told him. Higgs responded, "So you are 17, you'll be 18 in November?" K.M. nodded her head affirmatively and answered, "Yes, sir." K.M. then said that she understood she was "technically an adult." Though Higgs opined that Dryer's conduct could still be criminal, he too agreed that she was "not a child," given that she was 17 years old. Hence, Dryer's counsel either was aware or should have been aware before trial of K.M.'s age and recognized the corresponding inadmissibility of her testimony.

The State further argues that K.M.'s testimony was admissible on a ground independent from Article 38.37 of the Texas Code of Criminal Procedure. Specifically, the State posits that K.M.'s testimony was admissible to rebut the defense's "claim that I.D. had fabricated her allegations." *See, e.g.*, *Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008) (holding defensive theory of

fabrication raised in opening statement opened door to extraneous offenses). Thus, the State reasons, Dryer's lawyer was not deficient in failing to object to the admissibility of K.M.'s testimony under Article 38.37 because it was admissible on a different basis—to rebut the contention that I.D. lied about Dryer's abuse.

But the State presented K.M. as its second witness during its case in chief, before the defense had put on any evidence of its own and before the defense had engaged in cross-examination of a prosecution witness that was sufficient to raise a defense of fabrication. In addition, the defense had reserved its right to make an opening statement. Thus, when K.M. testified, the defense had not yet suggested before the jury that I.D. had fabricated her allegations of sexual abuse.

Under these circumstances, K.M.'s testimony about Dryer touching her thigh during the sleepover was not admissible as rebuttal evidence because the State cannot rebut a defensive theory of fabrication with evidence of extraneous offenses before the defensive theory is actually raised by the defense. That is, Texas law does not allow the State to introduce evidence of extraneous offenses in prebuttal of anticipated but as yet unraised defensive theories like fabrication. *See Smith v. State*, 420 S.W.3d 207, 219–20 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (noting that extraneous-offense evidence is admissible to rebut defensive theory raised in opening statement or through cross-examination of prosecution witnesses but that defense must have genuinely raised theory before rebuttal may occur); *see also De*

30

*La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) (agreeing mere denial of guilt does not open door to admission of extraneous offenses, as otherwise simple fact that defendant insisted on right to trial would make this evidence admissible).

In sum, we reject the State's arguments that defense counsel's failure to object to the admissibility of K.M.'s testimony under Article 38.37 was not deficient. Thus, we must next decide whether counsel's deficiency prejudiced the defense.

### *Prejudice*

A single error is not prejudicial for purposes of ineffective assistance unless it was both egregious and had a seriously deleterious impact on counsel's representation as a whole. *Frangias*, 450 S.W.3d at 136. Here, defense counsel's error—failing to object that K.M.'s testimony that Dryer touched her thigh at the sleepover was inadmissible under Article 38.37 because she was not a child—was both egregious and had a seriously deleterious impact on counsel's representation.

The inadmissibility of K.M.'s testimony is straightforward. K.M.'s videorecorded interview established that she was 17 years old at the time of the sleepover, and her age rendered her testimony inadmissible under Article 38.37.

The admission of this inadmissible testimony transformed the trial from a *he said, she said* dispute turning almost entirely on the jury's evaluation of I.D.'s and Dryer's credibility to a contest in which Dryer faced two separate accusers. K.M.'s allegation that Dryer touched her inappropriately at the sleepover ultimately

31

occupied at least as much time at trial as I.D.'s allegations of sexual abuse. The sleepover was discussed repeatedly and by multiple witnesses. During its case in chief, the State called four witnesses: Black, K.M., Higgs, and I.D. All four testified about the sleepover or K.M.'s allegations. In addition, two of the State's four rebuttal witnesses testified about the sleepover. Thus, while defense counsel's error was singular, the error occurred at the outset, during a pretrial hearing about the admissibility of the evidence at issue and impacted the trial from start to finish. Had defense counsel objected, the trial would have fundamentally differed.

As we have noted, testimony about separate alleged sex-related offenses admitted under Article 38.37 is damning evidence. K.M.'s testimony is no exception. While her testimony differed somewhat from I.D.'s, both witnesses testified to touching alone. K.M. testified that Dryer had touched her thigh and moved toward her "private area," which is where I.D. said he routinely touched her. I.D. also testified to other episodes of touching—these involving her buttocks—that occurred when she and Dryer were watching movies. K.M. likewise said Dryer touched her while they were watching a movie. Hence, K.M.'s testimony resembled I.D.'s testimony enough to corroborate I.D.'s allegations of sexual abuse against Dryer. K.M.'s testimony was substantial additional evidence of guilt.

Indeed, the State argued for the admission of K.M.'s testimony in part on this basis. The prosecutor asserted that K.M.'s testimony was "extremely important and

necessary for the State because the entire case rests on the testimony of the complaining witness." The prosecutor observed that there were "no other eyewitnesses" or "forensic evidence" or "medical evidence." Thus, the prosecutor reasoned, "having a second witness who can testify that the Defendant did something similar to her is incredibly corroborating." Later, in closing argument, the State pitched the same interpretation of the evidence to the jury, arguing that K.M.'s testimony "tells you everything that you need to know about the Defendant." The prosecutor elaborated that this was so because:

> [T]he defense raises that question. Who in the world would molest their daughter when the wall right there that you're looking at, on the other side of that is your sleeping wife? Who in the world would be so bold to do that? The same man that would sit on the couch and rub up on a girl's leg with two boys, including his son, in the same room.

Furthermore, K.M. was demonstrably emotional on the stand. The trial transcript twice notes that she cried during her testimony. On the second occasion, K.M. was so tearful that the trial court recessed proceedings after advising K.M. to "take a couple of deep breaths and calm down" and asking if K.M. needed some water. In closing, the State argued that K.M.'s emotion was a sign of veracity. The prosecutor rhetorically asked the members of the jury: "Do you really think that I brought in an Oscar-worthy actress to have a visceral, emotional reaction to the point that we had to take breaks?" The prosecutor further advocated that K.M.'s "emotions

tells [sic] you everything that you need to know about what happened in [I.D.'s] room at night."

In sum, K.M.'s testimony played a critical role at trial, with the subject of the sleepover and her allegations repeatedly resurfacing during the testimony of multiple witnesses. The State argued in part that the jury should believe both K.M. and I.D. based on the emotional character of K.M.'s testimony, which defense counsel could have readily kept the jury from hearing by making a simple objection before trial based on facts that either were known to counsel or should have been known to him. Counsel's failure to make this objection changed the course of the entire trial to Dryer's detriment without any conceivable strategic or tactical benefit to the defense. This is precisely the sort of situation in which a single error by counsel is both so egregious and has such a deleterious impact on the representation as a whole that it supports a claim of ineffective assistance of counsel on direct appeal.

On this record, defense counsel's error undermines our confidence in the trial's outcome. Evidence of extraneous offenses is inherently prejudicial and harms a defendant, in part because it forces the defendant to defend himself against charges that are not part of the present prosecution and also because it encourages the jury to convict based on bad character instead of proof of the specific crime charged. *Sims v. State*, 273 S.W.3d 291, 294–95 (Tex. Crim. App. 2008); *Daggett v. State*, 187 S.W.3d 444, 450–51 & n.12 (Tex. Crim. App. 2005). Here, the outcome of the

34

trial essentially depended on the jury's evaluation of the credibility of Dryer and his accuser, whose testimony was significantly corroborated by K.M.'s inadmissible testimony about her own similar encounter with Dryer. K.M.'s testimony therefore harmed the defense both by diminishing Dryer's credibility and bolstering I.D.'s testimony about the abuse. Furthermore, K.M.'s account of her encounter with Dryer pervaded the trial from start to finish, such that defense counsel's singular error had a significant impact on the representation as a whole. Under these circumstances, had the jury not heard from or about K.M., there is a reasonable probability that the outcome of the trial would have differed. *See Ex parte Menchaca*, 854 S.W.2d 128, 132–33 (Tex. Crim. App. 1993) (holding that lawyer's failure to prevent admission of inadmissible prior conviction for rape in drug prosecution was both deficient and prejudicial in significant part because it permeated entire guilt-innocence phase of trial, outcome rested entirely on credibility of witnesses, and prior conviction undermined defendant's credibility and thus heart of his defense); *see also Garcia v. State*, 308 S.W.3d 62, 66–69, 75–76 (Tex. App.—San Antonio 2009, no pet.) (holding that lawyer's opening of door to rebuttal evidence of defendant's sexual assault of second victim in prosecution for sexual assault was, among other failings, deficient and prejudicial given that sole viable defense depended on defendant's credibility); *Stone v. State*, 17 S.W.3d 348, 352–54 (Tex. App.—Corpus Christi 2000, pet. ref'd) (holding lawyer's introduction of otherwise inadmissible murder

conviction during trial's guilt-innocence phase in drug prosecution was both deficient and prejudicial because it diminished defendant's credibility, which was critical to his defense, and corroborated prosecution evidence about his behavior); *Ramirez v. State*, 873 S.W.2d 757, 762–63 (Tex. App.—El Paso 1994, pet. ref'd) (holding lawyer's failure to prevent admission of evidence of remote murder conviction during trial's guilt-innocence phase was deficient and prejudicial in that defendant claimed self-defense and his prior conviction both harmed his credibility and was used by prosecutor to argue that he had propensity to commit murder).

## CONCLUSION

We reverse the trial court's judgment and remand for a new trial. *See Ex parte Stamnitz*, 768 S.W.2d 461, 462 (Tex. App.—Houston [1st Dist.] 1989, no pet.) (holding correct remedy when reversing judgment of conviction due to ineffective assistance of trial counsel is to remand cause for new trial); *see also Lopez v. State*, 462 S.W.3d 180, 190 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (remanding for new punishment hearing due to ineffective assistance during sentencing stage).

> Gordon Goodman
> Justice

Panel consists of Justices Goodman, Hightower, and Guerra.

Publish. TEX. R. APP. P. 47.2(b).